UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

LAMAR JERMAINE ROUNDTREE,

                Petitioner,

   -vs-

ROBERT KIRKPATRICK,

                Respondent.

———————————————————————

**No. 11-CV-6188(MAT)**
**DECISION AND ORDER**

## I.   Introduction

<u>Pro</u> <u>se</u> petitioner Lamar Jermaine Roundtree ("Roundtree" or "Petitioner"), an inmate at Wende Correctional Facility, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on April 11, 2011. The petition challenges the constitutionality of a judgment of conviction entered against Roundtree on July 19, 2006, in the New York State Supreme Court, Monroe County, convicting him, following a jury trial, of intentional murder and two counts of criminal possession of a weapon.

## II.  Factual Background and Procedural History

The convictions here at issue stem from a shooting on June 26, 2005, outside Classics Bar on Thurston Road in the City of Rochester. The intended target was Detron Parker ("Parker"), a man with whom Roundtree had an ongoing dispute over a necklace. Unfortunately, Petitioner missed Parker and instead hit Lisa Barker ("Baker"), an innocent bystander. Baker later died at the hospital.

Roundtree was indicted on two counts of second degree murder (intentional and depraved indifference), and one count each of second and third degree criminal possession of a weapon, respectively. Roundtree's jury trial commenced April 25, 2006.

**A.    The Trial**

    **1.    The Prosecution's Case**

        **a.    Detron Parker**

Parker testified that he had known Roundtree "from around the neighborhood" since middle school. T.396.[1] They were once friends but, beginning around April of 2005, they had been engaged in a dispute over a gold necklace worth about $2,500, which Roundtree had borrowed from Parker but never returned. Roundtree told Parker that Parker would have to fight him to get back the chain. T.396-400, 423-25, 465-67.

On the evening of June 25, 2005, Parker had gone to Classics Bar and Grill at 685 Thurston Road where he saw Roundtree wearing a white T-shirt and a red baseball cap. T.400-01, 423, 426, 461. Parker was wearing a red, white, and blue baseball jersey and a white "do rag". T.420-21. The two men made eye contact but did not speak to each other. T.401, 428, 617, 632.

At around 1:30 a.m., Parker left the bar and stood talking to a friend, Arthur Long ("Long"), on the sidewalk in front of a

---

[1]

Citations to "T.__" refer to pages from the transcript of Roundtree's trial.

garage door on Thurston Road just north of, and directly next door to, the bar entrance. T.402-03. At some point, Parker noticed a lot of people trying to move out of the way. As Parker turned around, he made eye contact with a man, whom he identified in court as Roundtree. Roundtree was wearing a hooded sweatshirt and running across Thurston Road towards Parker. T.405-06, 408-09, 442. Petitioner was pointing a handgun—which Parker said may have been black with a brown handle—at Parker. T.405-07. As Parker dove to the ground, he saw Roundtree (who was about six feet away) fire two shots at him. T.411-12. The second shot was fired at a distance of "[n]ot even two feet" from Parker. T.409-12. Parker tried to crawl beneath a car parked in front of the garage door, and watched as Roundtree ran back across Thurston Road. T.412, 428-29. After the shooting was over, Parker thought he had been shot, so he had a friend drive him to the hospital where he was treated for a dislocated thumb. T.415-16.

When questioned on cross-examination about three pending criminal charges and one prior uncharged bad act, Parker invoked his Fifth Amendment privilege against self-incrimination. T.443-50.

### b.   Tasharra Brock

A second eyewitness, Tasharra Brock ("Tasharra"), confirmed Parker's account of the shooting. After arriving at Classics at about 11:30 p.m., Brock she spoke with a man wearing a "red, white and blue jersey," whom she identified in court as Roundtree.

T.522-524. Roundtree recommended that she "not . . . buy the drink because he was going to shoot the bar up." T.523. Brock told him not to do it, and then walked away and told her sisters about Roundtree's threat. T.524.

Later, as she was standing on the sidewalk outside the bar talking with her sisters, Brock saw a car parked in the driveway in front of the garage door next to the bar entrance with about ten people were standing around the car. T.526-27. Brock saw Roundtree jog across the sidewalk toward the car parked by the garage door. He was wearing a hooded sweatshirt and holding a handgun. T.527-30, 537, 543.

When he reached the car, Brock saw Roundtree fire three shots and run back across Thurston Road, heading south towards Brooks Avenue. T.530-33, 537-39, 543-44. Brock then heard three or more shots, but she could not determine the source. T.534.

### c.   Darrio Henry

A third eyewitness, Darrio Henry ("Henry"), tentatively identified Roundtree as the shooter. Henry, who had known Petitioner "[s]ince grade school," and had seen him "a million times" since then, testified that he saw Petitioner and Parker staring at each other inside Classics on the night of the shooting. T.614-17, 621, 632. Later, as Henry was leaving the bar, but before he exited the front door, he saw a man in a hooded sweatshirt,

carrying what looked like a black gun, run across Thurston Road. The man ran out of Henry's sight, but Henry heard two gunshots.

Henry then saw the man in the hooded sweatshirt run toward the intersection of Thurston Road and Brooks Avenue. T.619-23, 633-34. At around that time, Henry heard three more shots fired. T.623.

Although Henry only saw "part of" the man's face due to the hood, Henry recognized him as Petitioner, based on the man's build and gait. T.619-21, 626, 632-33. Although Petitioner and his brother, LaShawn, looked similar to each other, Henry was "sure" that the man in the hoody was not Petitioner's brother. Henry did not see LaShawn at Classics that night. T.630-31.

### d.   Kanza Williams

A fourth eyewitness, Kanza Williams ("Williams"), identified Petitioner as having stood across the street from Classics wearing a hooded sweatshirt. However, Williams did not see the shooting.

Williams had been at Classics with her ex-boyfriend and her mother. Williams saw her ex-boyfriend talking to Petitioner, whom she identified in court. Petitioner was wearing a red and white basketball jersey, a baseball cap, and gold caps on his lower teeth. T.308-11, 320-23. Williams left Classics at around 1:30 a.m. and walked across the street to the Rite Aid Pharmacy parking lot to her car.

There, Williams noticed Petitioner standing alone, "kind of hidden" behind a large bush next to the parking lot. T.309, 312-15,

333. She "glanced" at Petitioner, but did not "stare directly in his face." T.328-29, 331-32. He was wearing a hoody pulled over his head, and had his right hand positioned by his waistband. T.314-17, 322. It "looked really suspicious" to Williams. Having "a feeling that something was about to happen," Williams phoned a friend who was inside the bar and told her to leave. T.317. Williams then picked up the rest of her party, commenting to her ex-boyfriend that "[t]he guy that I saw in the bushes looks exactly like your friend you were talking to." T.329-31. They drove away before any shooting took place. T.318-19.

### e.  Other Eyewitnesses

Several other eyewitnesses either saw Roundtree at Classics on the night of the shooting or witnessed the shooting, but did not see the shooter's face and thus could not identify Petitioner as the shooter. Dumka Viator ("Viator") testified that at the time of the shooting, he was sitting in his car, parked facing north on Thurston Road across the street from Classics. T.471-73. Viator noticed a car parked in the driveway in front of the garage door next to Classics. One woman was sitting on the hood of the car talking to another woman standing nearby. T.473-74, 492, 494-95. Viator saw a man "tiptoeing" right in front of Viator's car, wearing a hoody and carrying a "silver-ish" pistol. T.475-78, 491-92, 496, 498. Viator could not see the man's face, and "guessed" that the man was around five feet, ten inches tall.

T.475, 498, 500. The man crossed Thurston Road in a "slight jog," bumped into a man talking on a cell phone, and then fired one shot when he was two or three feet away from the woman sitting on the car. T.478-81, 487, 489-90, 493-94, 499. The woman fell to the ground. T.480.

Viator saw the shooter then run south on Thurston Road and across Brooks Avenue towards Snuffy's Birdland, a restaurant on the corner of Thurston and Brooks. T.482-84. Viator believed that two more shots were fired after the shooter ran across Brooks Avenue, but he could not tell where the shots came from. T.484-85, 496.

Leslie Gordon ("Gordon") testified that, at around 1:40 a.m., she was standing outside Classics talking with her childhood friend, Lisa Baker, who was sitting on the hood of a car parked in front of the garage door just north of Classics. T.553, 557-58, 575. Since it was a warm night, a lot of people were milling around outside the bar. T.558-60, 577. As Gordon and Baker were preparing to leave, Baker got off the car. Gordon heard a loud gunshot from "really close," "right behind" Gordon, and then, within seconds, heard "a few more shots" coming from "a little further away," "from like Brooks Avenue." T.561-65, 568-69, 578-81. Gordon did not see the shooter. T.564.

Shawndell Hemphill ("Hemphill"), the bouncer at Classics, recalled Petitioner, whom he had seen on previous occasions, entering the bar on the night of the shooting at approximately

1:00 a.m. with a man named "Feon." T.502-03, 520. Hemphill described Petitioner as "maybe six feet, two or three inches" tall, and weighing "maybe 250 pounds". T.514-15. When Petitioner left the bar about an hour later, Hemphill saw him walk south towards the intersection of Thurston and Brooks. T.504-05, 513. Later, while Hemphill was standing just inside the bar's front door, he saw (through the bar's window) a man in a hoody come across the street and start shooting with a gun that "[m]ight have been silver." T.506-08, 511, 517-18. Hemphill did not see the shooter's face, however. He heard "maybe four or five" shots, but stayed inside the bar during the entire incident. T.510, 517. Hemphill then saw the man run towards Brooks Avenue in the direction of Snuffy's Birdland. T.510-11, 513.

Shawn Anderson ("Anderson") testified that, between 1:30 and 2:00 a.m., he was sitting in his SUV parked on Thurston Road, next to some bushes, just across the street from Classics. T.337-39. He noticed a black man, about six foot two or three inches tall, stooping in front of Anderson's SUV. The man was facing Classics, wearing a long-sleeved hoody with the hood up. T.336-40, 342, 344, 349-50, 355-57. Anderson could not see the man's face, but observed that he was holding a large "chrome-colored" handgun. T.340-41, 344. The man at first moved slowly, in a "stalking" manner, and ran across Thurston Road towards Classics, where some people were

standing. Anderson then heard, but did not see, one shot fired. T.343.

Walter Monroe ("Monroe") testified that at about 1:30 a.m., he was sitting in his car, parked on Thurston Road outside of Classics, waiting for a friend. T.358-62, 368-69. Monroe saw a man come across Thurston Road from the sidewalk adjacent to the Rite Aid parking lot. The man had a "sneaky" or "lurking" manner, wore a hoody with the hood up, and was five feet, eight inches to six feet tall. The man, who passed five to ten feet in front of Monroe's car, was carrying a "very nickel plated or shiny gun" in his right hand. T.364-67, 373. Monroe could not see the man's face, however. T.366. Monroe promptly called his friend, Gregory McKnight ("McKnight"), did a U-turn, and drove north on Thurston Road. After hearing two shots, he drove back to the bar. T.367-73.

McKnight testified that he left Classics near closing time after receiving a call from Monroe. T.375-78. McKnight walked around the corner and proceeded west on Brooks Avenue, when he heard at least two or three gunshots coming from the area of the bar. After McKnight got into his car, parked on Brooks Avenue, he heard two or three more shots coming from "real close." T.378-83, 393. Because McKnight was ducking for cover, he did not see who fired the shots. After the shooting stopped, McKnight saw a "guy with a chrome gun with a hoody on his head," about five feet nine

inches to six feet tall, running east on the Brooks Avenue sidewalk. T.383-85.

### f.   The Forensic Medical Evidence

After the shooting, Baker was responsive but in critical condition. T.184, 189-90, 204-06, 230-33, 565-70. At 2:02 a.m., paramedics transported her to Strong Memorial Hospital, where she died. T.208, 233-34, 570. Based on the autopsy, Baker was found to have died of a gunshot wound to the torso. Specifically, a single bullet entered her back; passed through her rib cage, right lung, diaphragm, and liver; and exited through her abdomen. No bullets or projectiles were recovered during the autopsy. T.769-79.

### g.   The Ballistics Evidence

Examination of a steel garage door adjacent to Classics revealed a hole about sixteen inches off the ground. There had been no holes in the garage door prior to the shooting. The police also discovered a "bullet strike mark" on the pavement in an alleyway or "tunnel" behind the garage door. A projectile was recovered on the ground in the rear of the alleyway, along with a plastic bucket with two bullet holes. T.206-18, 223-24, 264-65, 270-72, 292-300, 547-49. The prosecution's firearms examiner, John Clark ("Clark") testified that the projectile could have been fired from a .38 Special or .357 Magnum revolver, but it could not have been fired from a .380 caliber semi-automatic pistol. T.666-68, 701-02, 730,

736-37. The parties stipulated that blood found on the projectile in the alleyway matched the victim's DNA. T.646-51.

Examination of the victim's blouse revealed partially burned gunpowder around the bullet holes, predominantly those around the bullet hole on the back of the blouse. T.670-73, 756-57. This indicated that the bullet was fired from no more than five to six feet away. T.268-69, 277, 283, 668-73, 701, 710-11, 713-14, 734, 736, 739, 756-64.

Clark later conducted a reconstruction at the scene to determine the trajectory of the fatal bullet based on the location of the hole in the garage door and the strike mark on the pavement inside the alleyway. T.674-78, 681-85. He determined that, based upon the height of the firearm if fired from different distances from the garage door, the gun would have had to have been fired more than seven feet of the ground if the shooter was twenty feet away from the garage door. T.686-87. The street was more than thirty feet from the garage door. Thus, the fatal bullet could not have been fired from a passing car or from across the street, but must have been "fired from close range." T.685-87, 691-94, 728, 732-33, 740-41.

The police also discovered three .380-caliber shell casings on the Brooks Avenue sidewalk approximately twenty to forty feet west of Thurston Road, just around the corner from Classics. T.191-92, 249-50, 255-57, 280-81, 289-92. The firearms examiner determined

that the shell casings were all fired from the same .380 caliber semi-automatic pistol. T.660-66, 705-06. According to the firearms examiner, certain damage to a glass window at Snuffy's Birdland, at the corner of Thurston Road and Brooks Avenue, could have been caused by bullets fired from a .380-caliber pistol on Brooks Avenue. T.673-74, 694-98. However, bullets causing the damage at Snuffy's could not also have caused the hole in the garage door on Thurston Road. T.698-700, 734-36.

### 2.   The Defense Case

#### a.   Petitioner's Testimony

Petitioner testified on his own behalf that he was not at Classics or in the nearby area on the night of the murder but instead spent the night riding around alone in his car. He went to a bar at about midnight, and then went to his girlfriend's house at about 12:45 a.m., although she was already asleep. T.948-49, 956-57, 959-60. Because he was alone, nobody could verify his whereabouts. T.961. He also claimed that he is frequently mistaken for his brother, LaShawn, whom he described as 5'11" or 6'0" and approximately 220 to 225 pounds. T.947. Petitioner described himself as "[l]ike six-four" and 275 to 280 pounds.[2] T.947. Petitioner denied that he and Parker had had a dispute over a gold

---

[2]

Petitioner was arrested on July 1, 2005, at which time his height was recorded as 6'2" and his weight as 275 pounds. T.594-97. Petitioner had removable gold caps on his lower teeth. T.597-98.

necklace, but admitted that he and Parker had been in a fight two years earlier. T.953-54, 958. Petitioner's supervisor testified that petitioner worked a full forty-hour week following the shooting. T.840.

### b.   Other Defense Witnesses

J.W. Hardy, Jr. ("Hardy") testified that he was at Classics on the night of the murder, where he saw and greeted his barber, who happened to be Petitioner's brother, LaShawn Roundtree ("LaShawn"). T.793-95, 804-05, 823-25. Hardy testified that LaShawn looks similar to Petitioner. T.794. Hardy also saw Parker in the bar, wearing a white "do-rag." T.792-93. When Hardy was outside the bar smoking a cigarette, he heard a "big boom." T.795, 797, 809. Turning around, Hardy saw Parker fire a handgun and "[saw] a lady fall." T.798, 809-12. According to Hardy, Parker was facing toward the garage door when he fired. T.825-29. Parker then "dropped the gun, shook his hand, reached down and grabbed the gun." T.798, 810-12. Parker and another man ran across the street, got into a car, and drove north. T.799, 812-13. Hardy never told authorities about what he witnessed that night, claiming that he was afraid to do so because he was violating the terms of his parole by being out after curfew. T.815-18.

Simone Chatman ("Chatman") testified that she was outside the entrance to Classics when she saw "some guys across the street from the bar under the trees." T.896, 899-901. One of them then "ran

from across the street with a gun," and she then heard "around four" gunshots. T.897, 903. She described the shooter as a "tall, slim" black male, wearing a hooded sweatshirt. Although Chatman did not see the shooter's face, she did not think that the shooter had the same "physical appearance" as Petitioner. T.897-901.

William Barclay, Jr. ("Barclay") testified that he was outside the entrance to Classics just before 2:00 a.m., when he heard three sets of gunshots. T.931-940. He did not, however, see any individuals actually shooting. T.937, 940-41.

The jury also listened to a recording of a 911 call made by Lena Brock ("Lena") after the shooting. T.918-26. Lena told the 911 operator that the shooter was wearing a "do-rag," a blue shirt, and shorts. See T.1002-03, 1047 (summary of Lena's phone call by attorneys in their summations). Lena did not testify, however.

Petitioner's firearms examiner, Dennis Caliri ("Caliri"), agreed with the prosecution's expert that the recovered .38- or .357-caliber projectile could not have been fired from the recovered .380-caliber casings. T.852-56, 870. Caliri testified that he found a hole in the front brick wall of Classics, which, he opined, was caused by a nine millimeter projectile. T.859-64, 907. He conceded that the hole could have been caused by something other than a bullet, and that he did not know when the hole was created. T.907-16. Caliri also testified that a person could injure a thumb by mishandling a revolver or a semi-automatic pistol. T.857-58.

-14-

Harold Beemer, M.D. ("Dr. Beemer"), an orthopedic surgeon, provided testimony interpreting Parker's hospital records from immediately after the shooting. Parker apparently sustained a dislocated left thumb during the incident. Dr. Beemer testified that this was consistent with "gripping something that recoiled violently." T.874-886. Dr. Beemer acknowledged that such an injury could also have been caused by diving onto the pavement, but he believed that a more likely cause was gun recoil. T.886-87, 890-92.

### 3. The Verdict and Sentencing

The trial judge did not dismiss the depraved indifference murder count, as requested by defense counsel, but did not submit it to the jury. The jury returned a verdict finding Petitioner guilty of intentional murder and guilty of possession of a weapon in the second and third degrees. T.1095-98.

Petitioner moved to set aside the verdict based upon the affidavit of Eric Dolman ("Dolman"), who claimed to have committed the murder. Petitioner was later forced to withdraw his motion after the prosecution established that Dolman was actually incarcerated at the time of the homicide. See S.2-3.[3]

Petitioner was sentenced to an indeterminate term of imprisonment of 25 years to life for the murder charge, a determinate term imprisonment of 15 years plus five years of

---

[3]

Citations to "S.___" refer to the transcript of Petitioner's sentencing hearing.

post-release supervision for the second degree weapons charge, and a determinate term of imprisonment of seven years plus three years of post-release supervision for the third degree weapons charge. sentencing. The trial court ruled that the sentences for the two weapons convictions were to be served concurrently with each other, but consecutively to the murder sentence. S.16-17.

**B.    Post-Conviction Proceedings**

On July 9, 2010, the Appellate Division, Fourth Department, of New York State Supreme Court, modified Petitioner's sentences to run concurrently with each other but otherwise affirmed the judgment of conviction. People v. Roundtree, 75 A.D.3d 1136 (4th Dept. 2010). The New York Court of Appeals denied leave on September 22, 2010. People v. Roundtree, 15 N.Y.3d 855 (2010).

**C.    The Federal Habeas Proceeding**

Petitioner filed a pro se habeas corpus petition with this Court, dated April 11, 2011, simply incorporating by reference his appellate brief from his direct appeal. In response to Respondent's motion for a more definite statement pursuant to FED. R. CIV. P. 12(e), Petitioner submitted a "Reply Affidavit" stating that he "seeks review on every issue raised in his Federal Habeas Corpus Petition/Appellant Brief". Respondent then informed the Court that he would liberally construe the petition to incorporate all claims raised in Petitioner's brief on direct appeal to the Appellate Division, which was submitted as an attachment to the petition.

-16-

After Respondent answered, Petitioner moved for a "stay and abeyance" so that he could pursue certain unexhausted claims in state court. In a Decision and Order dated October 6, 2011, the Court (Siragusa, D.J.) denied the motion without prejudice, and directed Petitioner to "file a motion to amend his petition, along with a proposed amended petition, and a motion for stay-and-abeyance, which explains why he is entitled to the relief he seeks . . . ." Order dated Oct. 6, 2011, at 7 (Dkt. #17). Specifically, Judge Siragusa directed Petitioner to "explain why he failed to exhaust the claims sooner, and how the claims have merit." Id. at 7 n.5 (Dkt. #17). Petitioner has now submitted a renewed motion for "stay and abeyance." See Dkt. #19. Along with his motion to stay ("Stay Mot.") (Dkt. #19), Petitioner submitted a pleading which appears to be a "proposed amended petition" (Dkt. #18). Respondent filed a memorandum of law in opposition to the stay motion (Dkt. #20), to which Roundtree filed a reply (Dkt. #21).

For the reasons that follow, the motion to amend and motion to stay are denied with prejudice. Roundtree's request for a writ of habeas corpus is denied and the original petition is dismissed.

## III. The Motion to Stay and Motion to Amend

### A.   Overview of the Pleadings

As Respondent notes, the proposed amended petition ("Am. Pet.") appears to be a duplicate of the original petition. As did

the original petition, the amended petition's four enumerated grounds for relief simply reference Petitioner's counseled appellate brief on direct appeal by stating, "See Attached Brief" when asked to list the claims for habeas relief. See, e.g., Proposed Amended Petition, ¶12(a) (Dkt. #18). The proposed amended petition also states that Petitioner is "[i]n the process of filing Post Conviction Motion, raising Actual Innocence, Ineffective Assistance of Counsel and or Newly Discovered Evidence." Am. Pet., ¶13(b) (Dkt. #18).[4]

Petitioner's Motion to Stay sheds some light on the nature of the proposed amended claims. See Application For Stay and Abeyance ("Stay Appl."), ¶11 et seq. Construing the pleading with an extremely lenient eye, the two claims that this Court can discern in the stay motion as follows: First, Roundtree appears to raise a claim of ineffective assistance of trial counsel based upon a ballistics report obtained during a Freedom of Information Law request dated January 2, 2011, which Roundtree states establishes someone else was the shooter. Id., ¶4, 11. Second, Petitioner's "newly discovered evidence" claim apparently refers to another ballistics report obtained as the result of the F.O.I.L request, "grand jury minutes", and a "waiver of appeal". Id., ¶8. The

---

[4]

However, Petitioner has not commenced exhaustion proceedings in state court with regard to his claims of "Actual Innocence, Ineffective Assistance of Counsel and or Newly Discovered Evidence" because he apparently believes he requires a decision on the stay motion in order to do so. See Petitioner's Response (Dkt. #21).

reference to a claim of "Actual Innocence" appears to encompass all of this allegedly exculpatory evidence, which, according to Roundtree, exonerates him and establishes the culpability of a third party.

**B.   Application of the <u>Rhines</u> Standard**

The Supreme Court stated in <u>Rhines v. Weber</u> that "it likely would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had [1] good cause for his failure to exhaust, [2] his unexhausted claims are potentially meritorious, and [3] there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." 544 U.S. at 278. On the other hand, the Supreme Court explained, even if a petitioner had "good cause" for the failure to exhaust the claims first, it would be an abuse of discretion to grant a stay when the claims are "plainly meritless." <u>Id.</u> at 277 (citing 28 U.S.C. § 2254(b)(2)). Evaluating Roundtree's motion to stay against the considerations set forth by the Supreme Court in <u>Rhines v. Weber</u>, <u>supra</u>, the Court concludes that it would be an abuse of discretion to utilize the stay-and-abeyance procedure in this case.

With regard to the "good cause" prong, Petitioner acknowledges that he first sought to pursue his new claims by sending a F.O.I.L. request on January 2, 2011, to the Monroe County Public Safety Laboratory, seeking all reports, tests, notes, intake form, etc., produced in connection with his case number, as well as all

documentation produced relative to those reports. Stay Mot., ¶4 (Dkt. #19).  However, Petitioner's trial was held in 2006, and he has not explained why he waited nearly five years before filing the F.O.I.L. request.

Petitioner has also failed to establish that his new claims are not plainly meritless. The Court agrees with Respondent that Roundtree's papers are less than clear. He appears, however, to allege that his trial counsel rendered ineffective assistance by not following up on two ballistics reports issued in Petitioner's case by the MCPSL. Stay Mot., ¶¶7-11 (Dkt. #19). The reports alleged to be important each relate to Petitioner's case, which was assigned number 1387/05. See T.662; Stay Mot., Exhibits ("Exs.") E & F (Dkt. #19).

Petitioner does not claim—nor can he—that the prosecution failed to disclose these reports to trial counsel prior to trial. Instead, Petitioner appears to argue that he only recently obtained the reports through his F.O.I.L. requests, and thereby learned that trial counsel allegedly did not investigate the information contained in the reports. Id. The Court agrees with Respondent's interpretation of Petitioner's pleadings as faulting his counsel on two grounds—failing to investigate Jose Torres ("Torres") and Reginald Weaver ("Weaver") as having been the shooter.

First, Petitioner argues that "Report #9 show[s] that Jose Torres (Indictment #2007-0158) was arrested on or about

February 11, 2007 and charged with Possession of a Firearm (380 Auto Caliber handgun) matching the exact ballistics in petitioner's case." Stay Mot., ¶8 (Dkt. #19). In support of this assertion, Petitioner attaches the following documents: (1) Monroe Public Safety Laboratory Report #9, which describes ballistics tests on the .380-caliber shells recovered from the crime scene in Petitioner's case; and (2) the indictment of Torres for possession of a "380 auto caliber semi-automatic pistol." Stay Mot., Ex. E (Dkt. #19). As Respondent points out, however, both the prosecution's firearms expert and the expert retained by the defense testified that the victim in this case could *not* have been killed by a .380-caliber semi-automatic pistol. Instead, the projectile that killed the victim could have been fired from a .38 Special or .357 Magnum revolver. See T.666-68, 701-02, 730, 736-37, 852-56, 870. Thus, Petitioner is plainly incorrect that this line of inquiry involving the .380-caliber shells would have led to discovery that Torres was the actual shooter, because the gun Torres was accused of possessing could not have been the gun that fired the shots that killed Baker. In other words, Report #9 was not exculpatory.

Furthermore, the record does not support a finding that trial counsel neglected to investigate the issue of the .380-caliber shells recovered from the murder scene. Trial counsel elicited from the prosecution's firearms expert that the .380-caliber shells

found around the corner had been matched to a weapon used in a different shooting. T.718-19. It is thus apparent that counsel was aware of the issue involving the .380-shells. Further investigation would have been fruitless for the reasons discussed above.

Second, Petitioner argues that trial counsel failed to properly investigate "Report #8," which contains a comparison between (1) the projectile that killed the victim in Petitioner's case, and (2) a .38-caliber revolver recovered in the unrelated arrest of Parker's companion, Weaver. As Petitioner notes, Parker told police at the time that Weaver had accompanied him to the Classic Bar and Grill on the night of the murder. See Stay Mot., Ex. F ("Supporting Deposition" by Parker to the police) (Dkt. #19). Weaver later pled guilty in an unrelated matter to possessing a .38-caliber revolver. In any event, as Petitioner recognizes, Report #8 determined that the comparison between the projectile that killed Baker and the revolver recovered in Weaver's case was "inconclusive," as the weapon "could neither be identified nor eliminated" as the murder weapon. Stay Mot., ¶¶ 9-10 & Ex. F (Dkt. #19). Thus, contrary to Petitioner's contention, Report #8 was and is not conclusive evidence of his "actual innocence".

Furthermore, the record supports a finding that trial counsel did investigate this potential lead. As Respondent points out, defense counsel had the trial court sign a subpoena directed to the Rochester Police Department demanding all records involving

Weaver's arrest for possession of a .38-caliber revolver. <u>See</u> T.838-39.

In short, Petitioner has not demonstrated good cause for his failure to exhaust the ineffective assistance claims sooner or that these unexhausted claims are potentially meritorious. To the contrary, there is no basis for concluding that the reports obtained via the F.O.I.L. request are new evidence of Petitioner's actual innocence or that they demonstrate that trial counsel committed errors that prejudiced the defense. In these circumstances, invoking the stay-and-abeyance procedure would be an abuse of discretion. Accordingly, Petitioner's motion for a stay and motion to amend the petition are denied with prejudice.

## IV.   Exhaustion and Procedural Default

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 843-44 (1999). The exhaustion requirement is not satisfied unless the federal claim has been fairly presented to the state courts by invoking one complete round of the state's established appellate review process. <u>O'Sullivan</u>, 526 U.S. at 843-44.

Respondent concedes that Petitioner has exhausted all of his habeas claims except for two-that the evidence presented to the

grand jury was insufficient and that the verdict was against the weight of the evidence. Respondent argues that because Petitioner raised both claims solely in state law terms, he failed to fairly present the claims in constitutional terms to the state courts. See Baldwin v. Reese, 541 U.S. 27, 30-33 (2004) (finding ineffective appellate counsel claim to be unexhausted where petitioner raised it solely in state law terms in state court). As discussed below, these two claims, in addition to being unexhausted, are not cognizable on habeas review. Because resolution of the claims based upon their failure to raise a constitutional question is more expeditious than addressing the exhaustion issue, the Court elects to proceed in that manner.

**V.    Analysis of the Petition**

The standard set forth in the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), applies to this case since Roundtree filed his petition after AEDPA's effective date. See Brown v. Artuz, 283 F.3d 492, 498 n.2 (2d Cir. 2002). Nevertheless, since each of Petitioner's claims fails under the less deferential pre-AEDPA standard, there is no need to conduct the AEDPA's more intricate analysis. Cf. Kruelski v. Connecticut Superior Court for the Jud. Dist. of Danbury, 316 F.3d 103, 106-07 (2d Cir. 2003) (suggesting, in post-AEDPA cases, that habeas courts assess first whether state court's ruling was erroneous under "correct

interpretation" of the federal law at issue, then whether the ruling was unreasonable).

## A.    Insufficiency of the Evidence to Support the Indictment

The Second Circuit has held that "[i]f federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning a state grand jury proceeding are a fortiori foreclosed in a collateral attack brought in federal court." Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989) (citing United States v. Mechanik, 475 U.S. 66, 70 (1986) ("[T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.").

Roundtree's claim of error based upon the alleged insufficiency of the evidence presented to the grand jury was rendered harmless by the petit jury's return of guilty verdict after trial. See Lopez, 865 F.2d at 33 ("The particular claims of impropriety before the grand jury in this case concern the sufficiency of the evidence, a failure to develop exculpatory evidence by the prosecutor, the presentation of prejudicial evidence and error in explaining the law. Each of these alleged improprieties was cured in the trial before the petit jury, which

convicted. Under Mechanik, therefore, error before the grand jury, if any, was harmless.").

### B. Verdict Against the Weight of the Evidence

Petitioner incorporates his claim on direct appeal that the verdict was against the weight of the evidence, in which he asked the Appellate Division to exercise its statutory authority to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." N.Y. CRIM. PROC. LAW § 470.15(5). While a legal insufficiency claim is based on federal due process principles, Petitioner's a "weight of the evidence" argument is a pure state law claim grounded in the criminal procedure statute. People v. Bleakley, 69 N.Y.2d 490, 495, 515 N.Y.S.2d 761, 508 N.E.2d 672 (N.Y.1987).

Because Roundtree's weight of the evidence claim implicates only state law, it cannot provide a basis for habeas relief. See 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"); Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (habeas corpus review is not available where there is simply an alleged error of state law). Roundtree's weight-of-the-evidence claim accordingly is dismissed as not cognizable. See, e.g., Ex parte Craig, 282 F. 138, 148 (2d

-26-

Cir. 1922) (holding that "a writ of habeas corpus cannot be used to review the weight of evidence . . ."), aff'd, 263 U.S. 255 (1923).

### C.   Insufficiency of the Evidence to Support the Convictions

#### 1.   Procedural Default

Respondent argues that this claim is procedurally defaulted because the Appellate Division denied this claim by relying upon an independent state procedural ground-namely, that the defendant must make a specific trial order of dismissal after he presents a case-in-chief. Under the doctrine of procedural default, "a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." Martinez v. Ryan, 132 S. Ct. 1309, 1316 (2012) (citations omitted). Although the contemporaneous objection rule "is a firmly established and regularly followed New York procedural rule, it will not bar [a habeas court] from reviewing the federal claim on the merits if the application of the state rule to this case is exorbitant." Garvey v. Duncan, 485 F.3d 709, 718 (2d Cir. 2007). Under the particular facts of Petitioner's case, there is an issue as to whether defense counsel substantially complied with the rule given the realities of trial, and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest. Cotto v. herbert, 331 F.3d 217, 240 (2d Cir. 2003) (summarizing Lee v. Kemna, 534 U.S. 362, 375 (2002)). Accordingly, in the interest of

judicial economy, the Court proceeds to consider Roundtree's insufficiency-of-the-evidence claim, which is readily disposed of on the merits. See <u>Lambrix v. Singletary</u>, 520 U.S. 518, 523 (1997) (stating that bypassing procedural questions to reach the merits of a habeas petition is justified in rare situations, "for example, if the [underlying issues] are easily resolvable against the habeas petitioner, whereas the procedural bar issue involved complicated issues of state law").

### 2. Merits

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" <u>Jackson v. Virginia</u>, 443 U.S. 307, 315 (1979) (quotation omitted). "When it considers the sufficiency of the evidence of a state conviction, '[a] federal court must look to state law to determine the elements of the crime.'" <u>Fama v. Commissioner of Corr. Servs.</u>, 235 F.3d 804, 811 (2d Cir. 2000) (citation omitted). A habeas court is required to consider the trial evidence in the light most favorable to the prosecution, and must uphold the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Under <u>Jackson v. Virginia</u>, 443 U.S. at 319 (emphasis in original). The court must defer to the jury's assessment of the strength of the evidence and the credibility of

the witnesses, and may not substitute its view of the evidence for that of the jury. Id.

Here, Petitioner argues that the evidence was insufficient to support any of the three charges for which he was convicted. Under New York law, "[a] person is guilty of murder in the second degree when . . . [w]ith intent to cause the death of another person, he causes the death of such person or of a third person . . . ." N.Y. PENAL LAW § 125.25(1). A person is guilty of Criminal Possession of a Weapon in the Second Degree when he possesses a loaded firearm "with intent to use the same unlawfully against another." N.Y. PENAL LAW (former) § 265.03(2). "'Possess' means to have physical possession or otherwise to exercise dominion or control over tangible property." N.Y. PENAL LAW § 10.00(8). Section 265.15(4) of the Penal Law provides that the possession of any weapon "is presumptive evidence of intent to use the same unlawfully against another." N.Y. PENAL LAW § 265.15(4). A person is guilty of Criminal Possession of a Weapon in the Third Degree when he possesses a loaded firearm outside his home or place of business. N.Y. PENAL LAW (former) § 265.02(4).

Viewing the evidence in the light most favorable to the prosecution, and drawing all permissible inferences in the prosecution's favor, a rational fact-finder could have found that the elements of each of the three crimes had been established beyond a reasonable doubt. There was no dispute at trial that, in

the early morning of June 26, 2005, someone shot Baker in front of Classics Bar with a .38- or .357-caliber revolver, causing her death. Petitioner did not dispute that the shooter intended to kill someone, thereby satisfying the mens rea element under a theory of transferred intent. People v. Fernandez, 88 N.Y.2d 777, 781 (1996). ("The doctrine of 'transferred intent' serves to ensure that a person will be prosecuted for the crime he or she intended to commit even when, because of bad aim or some other 'lucky mistake,' the intended target [here, Parker] was not the actual victim [i.e., Baker].") The only issue in dispute was the identity of the shooter.

With regard to identity, the prosecution supplied several witnesses identifying Petitioner as the shooter. Parker, Tasharra, Henry, Williams, and Hemphill saw Petitioner at Classics on the night of the shooting, contrary to Petitioner's testimony that he was never at the bar that night. Prosecution witnesses Parker, Tasharra, Henry, Hemphill, Anderson, Monroe, Viator, and defense witness Chatman testified that the shooter wore a hoody and jogged across Thurston Road before shooting Baker. Four witnesses specifically identified Petitioner as the man in the hoody: Parker and Tasharra identified Petitioner as the shooter wearing a hooded shirt; Henry identified Petitioner as the shooter based on his gait and build; and Williams identified Petitioner as wearing a hoody and standing near the bushes across the street from Classics at

closing time. Tasharra also testified that Petitioner told her earlier, inside the bar, "not to buy the drink because he was going to shoot the bar up." T.523.

Under both federal and state law, "'the testimony of a single, uncorroborated eyewitness is generally sufficient to support conviction.'" United States v. Frampton, 382 F.3d 213, 222 (2d Cir. 2004) (quotation omitted); see also People v Arroyo, 54 N.Y.2d 567, 578 (N.Y.), cert. denied, 456 US 979 (1982). Here, the testimony of multiple eyewitnesses supported the identity element of the offenses. It was the proper role of the jury-not this habeas court-to resolve any minor inconsistencies in their testimony (e.g., the shooter's exact height or the color of the shooter's shirt). See Gruttola v. Hammock, 639 F.2d 922, 928 (2d Cir. 1981) (rejecting habeas petitioner's insufficiency-of-the-evidence claim and holding that jury was entitled to believe prosecution witnesses despite inconsistencies in their testimony).

Petitioner's testimony that he was not at Classics on the night of the shooting was contradicted by five witnesses, and this false alibi testimony indeed could be considered evidence of his guilt. See People v. Loliscio, 187 A.D.2d 172, 176 (2d Dept. 1993) ("There is overwhelming evidence of the defendant's consciousness of guilt. Most obviously, there is the evidence of his lies to the police and his attempt to create a false alibi, noted above."),

-31-

habeas corpus denied, Loliscio v. Goord, 263 F.3d 178, 190-91 (2d Cir. 2001).

In addition, Petitioner's chief eyewitness, Hardy, had a substantial criminal record. Hardy also asserted facts which were contradicted by all of the other eyewitnesses, including that the shooter was Parker; was not wearing a hoody and dropped his gun after firing; and that after running off with another man, the shooter jumped into a car on Thurston Road and drove north. Petitioner's only other eyewitness was Chatman, whose testimony was less than definitive: She testified that she did not see the shooter's face but believed that the shooter did not have the same physical appearance as Petitioner.

The Court further notes there is no requirement under New York law that the murder weapon be recovered by the police or introduced in evidence at trial. See, e.g., People v. Gragnano, 63 A.D.3d 1437, 1440 (3d Dept. 2009) ("[T]he evidence adduced at trial sufficiently established [assault and criminal possession of a weapon] notwithstanding the fact that the witnesses never saw the weapon and police were not able to recover it."), appeal denied, 13 N.Y.3d 939 (2010).

Petitioner's other arguments are belied by, or mischaracterize, the record. First, Petitioner argued that the evidence demonstrated that Petitioner was in the street or across the street at the time of the shooting and therefore, based on the

firearms examiner's testimony that the distance between the weapon and the victim was three to five feet when the fatal shot was fired, and the trajectory of the shot, Petitioner could not have been the person who fired the shot. However, as Respondent points out, Parker, Tasharra, Viator, and Gordon testified that the man wearing a hoody ran onto the sidewalk in front of the garage door before firing pointblank at the victim. William, Monroe, and McKnight did not see the shooting. Henry, Hemphill, Anderson, and Chatman did not provide testimony as to where the shooter precisely was standing when he fired. It is apparent that none of the eyewitnesses witnesses testified that Petitioner was "in or across the street" at the time of the shooting, as Petitioner assumes in support of this argument.

Petitioner's second argument relies on this chain of inferences: Because the man in the hoody was seen around the corner on Brooks Avenue, where the .380 casings were found, he must have fired the .380 rounds. Therefore, the man in the hoody could not have killed Baker, because the firearms experts agreed that Baker was killed with a .38- or .357-caliber revolver, and not a .380-caliber semi-automatic pistol. Petitioner concludes that even if he was the man in the hoody, he could not have fired the fatal .38- or .357- caliber rounds, because the man in the hoody fired the .380 rounds.

The Court agrees with Respondent that this argument relies on speculation and surmise. None of the witnesses testified to seeing who fired the shots that were heard from the direction of Brooks Avenue, if the .380 casings do indeed correspond to those shots-something which could not be ascertained by either firearms examiner. Apart from Hardy, no witness testified to seeing anyone other than the man in the hoody with a gun. Petitioner could and did argue that the .380 casings showed that the man in the hoody did not fire the fatal shot, but there was nothing in the record compelling the jury to accept that argument. In other words, for purposes of an insuffciency-of-the-evidence analysis, there was nothing in the record making it irrational for the jury to prefer the prosecution's argument which was supported by  the direct testimony of eyewitnesses who saw Petitioner open fire just a few feet away from Baker.

**D.    Ineffective Assistance of Trial Counsel**

    **1.    The Strickland Standard**

To demonstrate a violation of his Sixth Amendment right to the effective assistance of counsel, a petitioner must show that his attorney's representation was deficient in light of prevailing professional norms and that prejudice inured to him as a result of that deficient performance. Strickland v. Washington, 466 U.S. 668, 687 (1984). To satisfy the first prong, counsel's conduct must have "so undermined the proper functioning of the adversarial process"

that the process "cannot be relied on as having produced a just result[.]" Id. at 686. As to the second prong, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional" conduct, the result of the trial would have been different. Id. at 694.  "'[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.'" Greiner v. Wells, 417 F.3d 305, 319 (2d Cir. 2005) (alterations in original) (quoting Strickland, 466 U.S. at 697).

### 2. Application of Strickland to Counsel's Alleged Errors

#### a. Failure to Renew Motion for a Trial Order of Dismissal

Petitioner asserts, as he did on direct appeal, that trial counsel was ineffective because he failed to preserve Petitioner's sufficiency of the evidence claim by  failing to renew the motion for a trial order of dismissal. The Appellate Division rejected this claim, finding that, "[i]n view of [the Appellate Division's] determination that the evidence [was] legally sufficient to support the conviction," petitioner "was not denied effective assistance of counsel based on defense counsel's failure to renew the motion for a trial order of dismissal inasmuch as he failed to show that the motion, 'if made, would have been successful.'" Roundtree, 75 A.D.3d at 1137 (quoting People v. Marcial, 41 A.D.3d 1308, 1308 (4th Dept. 2007)).

As Respondent argues, the same reasoning mandates rejection of Petitioner's ineffectiveness claim here. Because the Appellate Division ruled in the alternative that Petitioner's sufficiency of the evidence claim was meritless, Petitioner cannot show that he was prejudiced by trial counsel's failure to preserve the claim. See, e.g., Baker v. Kirkpatrick, 768 F. Supp.2d 493, 501 (W.D.N.Y. 2011) ("[Petitioner] cannot demonstrate that he was prejudiced by the failure to preserve the insufficiency-of-the-evidence since the Appellate Division considered the merits of the issue notwithstanding the lack of preservation."); Gonzalez v. Cunningham, 670 F. Supp.2d 254, 263-64 (S.D.N.Y. 2009).

### b.   Pursuit of "Inconsistent and Incoherent" Defense Theories

Roundtree argues that trial counsel presented inconsistent and incoherent defense theories in relation to the evidence that Parker dislocated his thumb. Roundtree concedes that trial counsel offered helpful evidence that Parker's thumb injury could have been caused by improperly firing a handgun, but he complains that counsel only elicited "in passing" that Parker could have been injured by mishandling a .38- or .357-caliber revolver, i.e., the murder weapon. Roundtree faults counsel for what he describes as counsel's excessive focus on evidence that Parker was injured by firing .380-caliber pistol, which was not the murder weapon. The Appellate Division rejected this argument, finding that Roundtree had failed to demonstrate the absence of strategic or other legitimate

explanations for the alleged shortcoming.  <u>Roundtree</u>, 75 A.D.3d at 1138 (citation and internal quotation marks omitted).

Roundtree's complaints in this regard are belied by the record. Counsel did not pursue "incoherent" or "inconsistent" theories but instead, cogently and consistently, pursued the defense that Petitioner had been misidentified as the shooter and that Parker killed Baker. In his opening statement, trial counsel pointed out that no physical evidence tied Petitioner to the shooting. T.177, 180. Counsel also fulfilled his promise to produce testimony that Petitioner did not shoot Baker, calling several witnesses who testified affirmatively that someone else was the gunman or that the shooter's appearance did not match that of Petitioner.

In furtherance of the theory that Parker was the shooter, counsel noted that Parker had dislocated his left thumb during the gunfight and emphasized Parker's repeated lies about his injury to the police and medical personnel. T.178-79. Trial counsel elicited from both the prosecution's and the defense's firearms examiners that a person could injure his thumb by improperly firing either a revolver or a semi-automatic pistol. T.717-18, 857-58. The undisputed testimony was that Baker was killed with a revolver. Thus, the testimony obtained by counsel supported the defense theory that Parker dislocated his thumb when he fired the murder weapon. Counsel's theory also was supported by Hardy's eyewitness

testimony identifying Parker as the shooter. Thus, the record establishes that trial counsel competently presented what essentially was the only defense available in light of Petitioner's testimony that he was not at the bar that night, and made the most of the potentially favorable evidence involving Parker's dislocated thumb.

###     c.    Failure to Pursue a Justification Defense

Petitioner complains that trial counsel did not pursue a justification defense which could have explained or excused Petitioner firing the .38 caliber weapon, a claim which the Appellate Division rejected as an unsupported attack on counsel's trial strategy.

Counsel's decision not to pursue a justification defense represents a tactical choice that is "virtually unchallengeable." Strickland, 466 U.S. at 690. In this case, pursuit of a justification defense would have foreclosed the defense of misidentification, which was the most viable defense available to Roundtree. See, e.g., Thomas v. Zon, No. 04-CV-0471, 2009 WL 605231, at *10-11 (W.D.N.Y. Mar. 6, 2009) ("To the extent that a justification defense would have required petitioner to admit to the shooting, such a defense would have conflicted with the chosen strategy of arguing mistaken identity . . . ."). In addition, a mistaken identity defense allowed the jury to return a verdict of not guilty on all counts, but an assertion that the shooting was in

self-defense would not have provided a defense to weapons possession charges in the indictment. Thomas, 2009 WL 605231, at *11 (citing Spragion v. Smith, No. CV-04-1880, 2005 WL 3535158, at *6 (E.D.N.Y. Dec. 23, 2005)). Moreover, a justification defense simply was not plausible in light of the testimony that Petitioner had been hiding in the bushes and then ran out with his gun drawn. T.315, 340-341, 364-365. It is nearly inconceivable that defense counsel would have been able to obtain a jury instruction on the justification defense in light of evidence presented at trial.

### d. Failure to Call Petitioner's Brother to Testify

Petitioner asserted that, although witnesses testified that petitioner "bore a strong resemblance to his brother," LaShawn, whom Petitioner's appellate counsel asserted was in the gallery of the courtroom during trial. Petitioner argues that although the defense put forth was mistaken identity, counsel inexplicably never called LaShawn to testify that he was present at Classics Bar the night of the shooting. Again, the Appellate Division found that petitioner "failed to demonstrate the absence of strategic or other legitimate explanations for [counsel's] alleged shortcomings." Roundtree, 75 A.D.3d at 1138 (citation and internal quotation marks omitted).

As an initial matter, Petitioner has never supplied an affidavit from LaShawn to substantiate the claim that he indeed would have testified to being at Classics that night. "It is too

easy for a defendant to claim after the fact, without supporting evidence, that he provided leads and information to his counsel that would have resulted in his exoneration if used." Mallet v. Miller, 432 F. Supp. 2d 366, 388 (S.D.N.Y. 2006). "Habeas claims based on complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified [to] are largely speculative." Lou v. Mantello, No. 98-CV-5542 (JG), 2001 WL 1152817, at *10 (E.D.N.Y. Sept. 25, 2001) (interior quotation and citation omitted); see also Ortiz v. Artus, No. 06 Civ. 6444, 2008 WL 2369218, at *7 (S.D.N.Y. June 9, 2008) (rejecting ineffective counsel claim where petitioner failed to submit affidavit from alleged alibi witness; "petitioner's conclusory assertion that his wife would have provided exculpatory testimony is insufficient to establish ineffective assistance of counsel"), report and recommendation adopted, 2010 WL 3238994 (S.D.N.Y. Aug. 11, 2010). Here, Petitioner cannot establish how, if at all, he was prejudiced by counsel's failure to call LaShawn since he has not demonstrated that LaShawn would have provided the hoped-for testimony.

Furthermore, "the tactical decision of whether to call specific witnesses-even ones that might offer exculpatory evidence-is ordinarily not viewed as a lapse in professional representation." United States v. Schmidt, 105 F.3d 82, 90 (2d Cir.

1997); accord United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987). Here, defense counsel had a reasonable strategic basis for not calling LaShawn as Petitioner's own testimony regarding the difference between his and LaShawn's builds foreclosed such a mistaken identity defense. Petitioner described LaShawn as 5'11" or 6'0" and approximately 220 to 225 pounds, and described himself as "[l]ike six-four" and 275 to 280 pounds, a sizeable difference. T.947. In addition, Henry testified that he was certain that he saw Petitioner, and not LaShawn, at Classics on the night of the murder. T.630-31.

### d. Inadequate Cross-Examination of Firearms Expert

Petitioner argues that trial counsel permitted the prosecution's firearms examiner to testify about bullet ricochet evidence, glass damage, and strike mark evidence without any foundation establishing either that the testing conducted was sufficiently accepted within the scientific community or that the witness was sufficiently qualified by either training or experience to offer expert testimony. Petitioner argues that trial counsel should have demanded a hearing to voir dire the expert, and "could have and should have kept this evidence out with appropriate objections to the qualifications of the expert's qualifications [sic] and to the subjects testified to as not proper topics for expert testimony." Defendant's Appellate Brief at 41-42.

"The conduct of examination and cross examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." Eze v. Senkowski, 321 F.3d 110, 127 (2d Cir. 2003) (citations and internal quotation marks omitted). Notably, Petitioner does not explain how the firearms expert's qualifications could have been attacked, but merely lists boilerplate questions typically asked when qualifying an expert witness.

Here, Clark testified to his extensive training and experience in, among other things, bullet trajectory analysis and shooting reconstructions, and stated that he had testified as a firearms expert in over one hundred cases. T.653-59. He clearly was sufficiently qualified, and his conclusions were based upon an in situ investigation and reconstruction of the shooting. Cf. People v. Chambers, 6 A.D.3d 454, 454-55 (2d Dept. 2004) (prosecution failed to lay a proper foundation for admission of expert's bullet trajectory analysis, which was based solely on examination of photographs of automobile in which alleged shooting took place, and involved no examination of automobile itself). Furthermore, bullet trajectory analyses have long been a proper subject of expert testimony. E.g., People v. Dewey, 23 A.D.2d 960, 960, 261 N.Y.S.2d 193 (4th Dept. 1965).

### e.  Untimely Request for a Missing Witness Jury Instruction

Petitioner argues that trial counsel erred by asserting a belated request for a missing witness instruction as to Parker's friend, Long; and Feon, who was seen with Petitioner at Classics. See T.978-80. To be entitled to a missing witness charge under New York law, Petitioner was required to show that 1) the absent witness was knowledgeable about an issue material to the trial; 2) that he was expected to give noncumulative testimony favorable to the prosecution, and 3) that the absent witness was available to the prosecution. E.g., People v. Macana, 84 N.Y.2d 173, 177 (1994).

The trial court denied the request, noting that it was untimely. T.980. In addition, the trial court observed, Long was "not available and [was] not under the People's control," as he had left for Russia one month before trial. T.978, 980-81. Similarly, there was no evidence in the record that "Feon" was either available, under the prosecution's control, or in possession of non-cumulative testimony favorable to the prosecution. The only reference to Feon at trial was testimony by Hemphill, the bouncer, that Petitioner entered Classics on the night of the shooting with a man named Feon. T.502-03, 520.

To succeed on the claim that the judge erroneously declined to give a jury instruction, a habeas petitioner must show that the judge's omission (1) violated New York law and (2) resulted in a deprivation of his right to due process. Jackson v. Edwards, 404

-43-

F.3d 612, 621 (2d Cir. 2005). Petitioner has offered no evidence whatsoever-much less clear and convincing evidence-that the trial court's factual findings regarding the uncalled witnesses were erroneous. They therefore must be presumed correct. See 28 U.S.C. § 2254(e)(1). Accordingly, petitioner has not shown that failure to give a missing witness instruction was even an error of state law. See, e.g., Moultrie v. Marshall, No. 06 Civ 5419, 2009 WL 3097102, at *7 (S.D.N.Y. Sept. 28, 2009) (denying habeas relief based on trial court's failure to issue missing witness instruction as to informant, where petitioner had not overcome presumption of correctness accorded to trial court's finding that informant was not under the prosecution's control). It follows that Petitioner cannot establish prejudice resulting from the tardiness of defense counsel's request because there is no reasonable probability that the instructions would have been granted had they been timely.

   **E.   Erroneous Evidentiary Rulings**

   A state court's evidentiary rulings, even if erroneous under state law, do not present constitutional issues cognizable under federal habeas review. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); accord Hawkins v. Costello, 460 F.3d 238, 244 (2d Cir. 2006) (citing Crane v. Kentucky, 476 U.S. 683, 689 (1986)). "In order to prevail on a claim that an evidentiary error deprived the defendant of due process under the Fourteenth Amendment he must show that the error was so pervasive as to have denied him a

fundamentally fair trial . . . ." <u>Collins v. Scully</u>, 755 F.2d 16, 18 (2d Cir. 1985). Here, Roundtree has not demonstrated any errors of state evidentiary law, let alone errors of constitutional magnitude.

### 1.   Erroneous Display of Autopsy Photo to Witness

First, Petitioner first claims that the trial court improperly permitted the prosecutor to display to the victim's friend, Gordon, the autopsy "mug shot" of the victim in order to make the witness cry on the stand, and thereby appeal to the jury's sympathies.

In New York, photographs are generally admissible if they tend to prove or disprove some material fact in issue, even if the photographs "portray a gruesome spectacle and may tend to arouse passion and resentment against the defendant in the minds of the jury." <u>People v. Pobliner</u>, 32 N.Y.2d 356, 369-70 (N.Y. 1973) (internal quotation marks and citations omitted), <u>cert.</u> <u>denied</u>, 416 U.S. 905 (1974). Petitioner cited no authority for the proposition that an admissible exhibit cannot be shown to a witness if the witness might cry. Rather, the decisions Petitioner cited, <u>e.g.</u>, <u>People v. Pobliner</u>, 32 N.Y.2d at 369-70, involved graphic photographs shown to a jury.

Even though defense counsel was willing to stipulate to the identity of the victim, the prosecution was not required to accept that stipulation. <u>See</u> <u>People v. Hills</u>, 140 A.D.2d 71, 79-80 (2d Dept. 1988) (stating that "a defendant's offer to stipulate is

not a sound basis for precluding the prosecution from presenting relevant material evidence as to an element of a charged crime").

### 2.   Erroneous Testimony by Firearms Examiner

Petitioner claims that the trial court erred by permitting the prosecution's firearms examiner to testify that the .380-caliber rounds fired from the .380-caliber casings recovered could have caused the glass damage he observed at Snuffy's Birdland, and that it would be impossible for one of those same bullets to have ricocheted off the glass and caused the hole in the garage door in the alleyway near where the victim was shot. See T.695, 697-99. As the firearms examiner was properly qualified as an expert, it was appropriate for him testify about whether bullets could have caused the damage observed at Snuffy's and the possible ricochet paths of such bullets.

### 3.   Erroneous Exclusion of Testimony Regarding Petitioner's Statements to Police

Petitioner contends that the trial court wrongly precluded testimony by Investigator Charles Dominic ("Dominic") and by Petitioner describing Petitioner's allegedly exculpatory conversation with Dominic following his arrest. See T.600-03, 951. "New York law is well-settled that exculpatory statements by an accused constitute hearsay and are inadmissible." Shaheed v. Martuscello, No. 10 Civ. 3288, 2011 WL 73144, at *5 (E.D.N.Y. Jan. 10, 2011) (citing, inter alia, People v. Brown, 159 A.D.2d 956, 956 (4th Dept. 1990) ("The court properly rejected defendant's attempt

to introduce as evidence his written statement made to police shortly after he was taken into custody. The statement was not contrary to defendant's penal interest. . . .") (citations omitted)). Dominic's statements to Petitioner during the interview were irrelevant and plainly an attempt to admit Petitioner's statements to Dominic–which were inadmissible hearsay–through the "back door." T.601-02.

### 4.   Erroneous Restriction of Cross-Examination

Petitioner asserts that the trial court erred by precluding trial counsel from eliciting from Dominic that (1) Parker did not tell the investigator that he went to Strong Memorial Hospital, contrary to Parker's direct examination testimony; (2) Dominic had been given differing descriptions of the shooter; and (3) the description of the shooter provided to Dominic matched Parker, not Petitioner.

This line of testimony involved a collateral matter directed solely at the Parker's credibility. In attempting to impeach Parker with "prior inconsistent statements" while cross-examining a different witness, Dominic, defense counsel ran afoul of the collateral impeachment rule. People v. Inniss, 83 N.Y.2d 653, 657-58 (1994) (citing People v. Pavao, 59 N.Y.2d 282, 288-289 (1983) ("It is well established that the party who is cross-examining a witness cannot introduce extrinsic documentary evidence or call other witnesses to contradict a witness' answers concerning

collateral matters solely for the purpose of impeaching that witness' credibility.")). Defense counsel had already covered that material on Parker's cross-examination, where it was appropriate. Defense counsel was bound by Parker's answer during cross-examination, and the trial court did not err in precluding further pursuit of this collateral issue. E.g., In re Blaize F., 50 A.D.3d 1182, 1183 (3d Dept. 2008) (citing People v. Bellamy, 26 A.D.3d 638, 641 (2006)).

Defense counsel's question to Dominic as to whether he was given different descriptions of the shooter was improper because, inter alia, it called for a hearsay response. See McLean v. McGinnis, 29 F. Supp.2d 83, 93 (E.D.N.Y. 1998) ("Tee's repetition of Garcia's alleged out-of-court physical description of the second shooter constitutes hearsay. Respondent argues, therefore, that the testimony concerning Garcia's prior identification and description could properly have been admitted as substantive evidence only if the surrounding circumstances demonstrated that it had such strong probative value and indicia of reliability that the State had no legitimate interest in precluding the testimony on grounds of unreliability. I agree with respondent that petitioner has not met this standard here.") (internal citation omitted).

Finally, defense counsel's question to Dominic as to whether an unidentified individual provided a description of the shooter as being "about 195, plus or minus 10 pounds," was an attempt to

introduce an out-of-court statement by an unavailable declarant for the truth of the matter therein, and therefore inadmissible hearsay.

### F. Denial of Jury Instruction

Petitioner claims that the trial court erred by refusing to charge the jury that, in order to convict him of criminal possession of a weapon, it would have to find that he possessed the murder weapon. The Appellate Division summarily rejected this claim as "lacking in merit." Roundtree, 75 A.D.3d at 1138.

The Court agrees with Respondent that this contention is academic because the jury, by finding him guilty of intentional murder, necessarily found that he did, in fact, possess the murder weapon. See United States v. Carrillo, 229 F.3d 177, 186 (2d Cir. 2000) ("Notwithstanding the trial court's failure to instruct the jury that an overt act is an essential element of the crime of conspiracy under New York law, the jury necessarily found an overt act committed in furtherance of each murder conspiracy.").

### G.   Erroneous Imposition of Consecutive Sentences

Petitioner claimed on direct appeal, and the prosecution conceded, that the trial court erred by imposing consecutive sentences for second degree murder and possession of the murder weapon. As a result, the Appellate Division directed that Petitioner's sentences be modified to run concurrently. Roundtree, 75 A.D.3d at 1138. Accordingly, Petitioner's habeas claim

-49-

requesting the same relief must be denied as moot. <u>See</u> <u>Paul v.</u> <u>Ercole</u>, No. 07 Civ. 9462, 2010 WL 2899645, at *7 (S.D.N.Y. June 10, 2010) ("Two of petitioner's claims are moot because the Appellate Division has already granted petitioner the relief he was seeking on those claims. In the Appellate Division, petitioner prevailed on his claim that the sentence imposed for the count of criminal possession of a weapon in the third-degree was illegal and that the imposition of DNA databank fee violated the prohibition against ex-post facto laws."), <u>report</u> <u>adopted</u>, 2010 WL 2884720 (S.D.N.Y. July 21, 2010).

### H.   Vindictive Sentencing

Petitioner argued on direct appeal that the trial court's comments at sentencing suggested that the sentence was intended to punish Petitioner for unsuccessfully exercising his right to a trial. At sentencing, defense counsel argued for leniency on the ground that the trial court had indicated prior to trial that if Petitioner pled guilty, it would be willing to agree to a sentence of twenty years to life imprisonment. S.13. The trial court responded, "Where do you think that [i.e., the plea offer] is at this point? Do you think that's valid at this point?" S.13. The trial court also observed that, following Petitioner's rejection of the plea option, the offer was "no longer on the table." S.14-15. From these comments, Petitioner inferred that the trial court

vindictively sentenced him for exercising his constitutional rights. This Court disagrees.

The imposition of a penalty upon an individual for choosing to exercise a constitutionally protected right is, of course, improper. Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978). The mere fact that the sentence imposed following trial is lengthier than the offer made during plea negotiations does not indicate that a defendant has been punished for exercising his right to proceed to trial. E.g., Corbitt v. New Jersey, 439 U.S. 212, 219, 223 (1978) ("There is no doubt that those homicide defendants who are willing to plead non vult may be treated more leniently than those who go to trial, but withholding the possibility of leniency from the latter cannot be equated with impermissible punishment as long as our cases sustaining plea bargaining remain undisturbed."); United States v. Araujo, 539 F.2d 287, 292 (2d Cir. 1976). The trial judge here never stated or implied that the sentence was based on Roundtree's refusal of the plea offer. His statements referring to the plea offer were made solely in response to defense counsel's reminder to the judge that he had agreed to a 20-to-life sentence if Petitioner had pled guilty, as part of defense counsel's advocacy on behalf of Petitioner for a less-than-maximum sentence.

I.    **Denial of Due Process at Sentencing**

Petitioner also argues that the court erred by stating at sentencing that "the jury determined that [petitioner] committed perjury at the trial by their verdict. They have said you are a liar under oath." S.15. A judge's discretion in sentencing is "largely unlimited either as to the kind of information he may consider, or the source from which it may come," with the exception of "materially false" information. Hili v. Sciarrotta, 140 F.3d 210, 215 (2d Cir. 1998) (citation and internal quotation marks omitted).

Even if the judge's comments were ill-advised, they did not deprive Petitioner of his constitutional rights. Although Petitioner was not indicted for perjury, it is not unreasonable to conclude that the jury found that he had lied under oath, as the guilty verdict rendered could not possibly be reconciled with Petitioner's sworn testimony that he was not present at, or in the vicinity of, Classics at the time of the murder. In addition, a sentencing court may take into account a defendant's untruthfulness under oath during trial. See United States v. Dunnigan, 507 U.S. 87, 97-98 (1993) (affirming sentence enhancement for unindicted perjury under federal Sentencing Guidelines; noting that "[i]t is rational for a sentencing authority to conclude that a defendant who commits a crime and then perjures herself in an unlawful attempt to avoid responsibility is more threatening to society and

less deserving of leniency than a defendant who does not so defy the trial process"); accord, e.g., United States v. Anderson, 59 F.3d 164, 1995 WL 391964, at *1 (1ˢᵗ Cir. June 29, 1995).

### J.   Harsh and Excessive Sentence

Roundtree contends that the sentence imposed by the court for the murder conviction was harsh and excessive. When he raised this claim on his direct appeal, Petitioner urged the Appellate Division to reduce the sentence under N.Y. CRIM. PROC. LAW §§ 470.15(2)(c), 470.15(6)(b), which gives the state court broad plenary power to modify a sentence that is unduly harsh or severe, though legal. The Appellate Division concluded that the sentence was not unduly harsh or severe. Roundtree, 75 A.D.3d at 1138.

A petitioner's assertion that a sentencing judge abused his discretion in sentencing is generally not a federal claim subject to review by a habeas court. See Fielding v. LeFevre, 548 F.2d 1102, 1109 (2d Cir. 1977) (holding that petitioner raised no cognizable federal claim by seeking to prove that state judge abused his sentencing discretion by disregarding psychiatric reports) (citing Townsend v. Burke, 334 U.S. 736, 741 (1948)). Where, as here, a defendant's sentence is within the statutory range provided for by New York law, courts in this Circuit have held that it does not present a constitutional claim amenable to review in a federal habeas corpus. See, e.g., White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is

presented where, as here, the [habeas petitioner's] sentence is within the range prescribed by state law.") (citing <u>Underwood v. Kelly</u>, 692 F. Supp. 146 (E.D.N.Y. 1988), <u>aff'd</u> <u>mem.</u>, 875 F.2d 857 (2d Cir. 1989).

Under New York law, second degree murder is a class A-I felony, <u>see</u> N.Y. PENAL LAW § 125.25(1), punishable by an indeterminate term of imprisonment having a minimum of 15 to 25 years and a maximum of life. <u>See</u> N.Y. PENAL LAW § 70.00 (2), (3). As Petitioner concedes, his indeterminate term of twenty five years to life imprisonment falls within the applicable statutory range. Therefore, his harsh-and-excessive sentence claim does not present a constitutional question cognizable on habeas review.

## VI. Conclusion

For the reasons stated above, Lamar Jermaine Roundtree's petition (Dkt. #1) for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Roundtree's motion for leave to file an amended petition (Dkt. #18) and motion for a stay and abeyance (Dkt. #19) are dismissed with prejudice for the reasons discussed above.

Because Roundtree has failed to make a substantial showing of a denial of a constitutional right, the Court declines to issue a certificate of appealability. <u>See</u> 28 U.S.C. § 2253(c)(2). The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and

therefore denies leave to appeal as a poor person. <u>Coppedge v. United States</u>, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**


                                    S/Michael A. Telesca
                         _____
                                    HONORABLE MICHAEL A. TELESCA
                                    United States District Judge

Dated:      April 23, 2012
            Rochester, New York.

-55-